RENDELL, Circuit Judge,
dissenting:
While I recognize that AEDPA “ ‘imposes a highly deferential standard for evaluating state-court rulings’ and ‘demands that state court decisions be given the benefit of the doubt,’ ” Felkner v. Jackson, - U.S. -, 131 S.Ct. 1305, 1308, 179 L.Ed.2d 374 (2011) (quoting Renico v. Lett, 559 U.S. 766, 772, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010)), I disagree with the majority’s conclusion that the state court engaged in an objectively reasonable application of step three of the Batson inquiry on direct appeal. The record of both the *133 state trial and appellate court proceedings reveal that both courts ended their analysis at step two. Thus, the Batson claim was never fully adjudicated on the merits. Where this error occurs in the state courts, our precedent dictates that we should conduct the step three analysis ourselves and determine from the voir dire transcripts whether the strikes were pre-textual. See, e.g., Hardcastle v. Horn, 368 F.3d 246, 262 (3d Cir.2004). If that is not possible, habeas should be granted. See Simmons v. Beyer, 44 F.3d 1160, 1168 (3d Cir.1995). I do not vote to grant habeas relief in this case lightly, but given our inability to reconstruct all that occurred in voir dire,[1] and given the questions raised by the portion of the record that we do have, I do not hesitate to urge that habeas relief should be afforded to Mr. Hairston.
I.
A.
It is worth elaborating upon the analysis required in the Batson three-step inquiry in order to parse out the difference between steps two and three. After a defendant establishes a prima facie case of purposeful discrimination at step one, at step two, “the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.” Batson v. Kentucky, 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Batson Court held that the “neutral explanation” should be “related to the particular case to be tried” and should not merely be an affirmation of the prosecutor’s good faith. Id. at 98, 106 S.Ct. 1712. Only if the trial court accepts the prosecutor’s explanation at step two to be “facially valid[ ],” will it proceed to step three. Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
At step three, “the trial court ... [has] the duty to determine if the defendant has established purposeful discrimination.” Batson, 476 U.S. at 98, 106 S.Ct. 1712. “In deciding if the defendant has carried his burden of persuasion, a court must undertake ‘a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.’ ” Id. at 93, 106 S.Ct. 1712 (quoting Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). Though the Supreme Court in Batson declined “to formulate particular procedures to be followed,” id. at 99, 106 S.Ct. 1712, in performing the inquiry at each step, it notably drew upon Title VII jurisprudence to describe the burden shifting framework applicable in a Batson challenge. The Court stated, “[o]ur decisions concerning ‘disparate treatment’ under Title VII of the Civil Rights Act of 1964 have explained the operation of prima facie burden of proof rules. The party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion.” id. at 94 n. 18, 106 S.Ct. 1712 (citing McDonnell Douglas Corp. v. *134 Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)).
In McDonnell Douglas, the Supreme Court established the three-step burden shifting framework applicable in an employment discrimination case under Title VII. First, the employee must make out a prima facie case of discrimination. 411 U.S. at 802, 93 S.Ct. 1817. The burden then shifts to the employer to present a nondiscriminatory reason for the adverse employment action the employee has suffered. Id. Finally, the employee must demonstrate that the reason given by the employer is pretextual. Id. at 804, 93 S.Ct. 1817. In Burdine, the Court explained that an employee could meet his burden by “persuading the court that a discriminatory reason more likely motivated the employer or ... by showing that the employer’s proffered explanation is unworthy of credence.” 450 U.S. at 256, 101 S.Ct. 1089. The McDonnell Douglas Court noted that particularly relevant at the third step would be evidence that employees similarly situated to the plaintiff, but of a different race, did not suffer adverse employment action. 411 U.S. at 804, 93 S.Ct. 1817 (“Especially relevant to [ ] a showing [of pretext] would be evidence that white employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained or rehired.”).
Although the Batson Court did not explicitly elaborate upon the analysis required at step three, by pointing to the McDonnell Douglas burden shifting framework, the Court made clear that a Batson challenger has an analogous burden to show that opposing counsel’s justifications for the challenged peremptory strikes are pretextual.[2] Once a defendant is given “a full and fair opportunity to demonstrate that” the reasons offered by the prosecutor for his use of peremptory strikes “were in fact a coverup for a racially discriminatory decision,” McDonnell Douglas, 411 U.S. at 805, 93 S.Ct. 1817, the trial court “must decide which party’s explanation of the [prosecutor’s] motivation it believes.” Aikens, 460 U.S. at 716, 103 S.Ct. 1478. In other words, the trial court must make a finding of fact as to the prosecutor’s true intentions. Difficult as making such a finding may be, the Supreme Court explained in Aikens, another Title VII case cited in Batson, “[t]he law often obliges finders of fact to inquire into a person’s state of mind,” id. at 716, 103 S.Ct. 1478, by comparing the treatment of the plaintiff with the treatment of others.
B.
Similarly, at step three of Batson, it is the exercise of comparing that is key. Here, it is abundantly clear that both the state trial and appellate courts failed to reach step three. The majority relies primarily upon Bond v. Beard, 539 F.3d 256 (3d Cir.2008), in asserting that the state courts reached step three of Batson. In Bond, we found that the trial court reached the necessary step three conclusion when it stated: “Reviewing the totality of the circumstances, there is no show *135 ing of intentional discrimination by the prosecutor in the jury selection process and defendants are not entitled to a new trial on that basis.” 589 F.3d at 267 (citations omitted). We explained:
Here, the trial court does more than conclude that the prosecutor offered a race-neutral explanation for a strike; it concludes that Bond did not meet his burden of showing that purposeful racial discrimination, not the proffered explanation, motivated the prosecutor’s conduct. This step-three conclusion indicates that the trial court indeed did understand the steps of a Batson analysis.
Id. at 268-69.
In Bond, it was clear that the trial court made a determination as to whether the defendant had met his ultimate burden of showing intentional discrimination. Here, the trial court made no such finding. Rather, instead, the trial judge robbed defense counsel of the opportunity to carry his burden at step three, stating that he did not “have a right” to put “himself into [the] prosecutor’s shoes,” (App.92) and critique the prosecutor’s treatment of other jurors. Furthermore, the court suggested that a step three determination was impossible because, “[a]fter an hour and a half interview of anybody it is possible for either side to conclude that a segment supports their position.” (App.94.) As the majority notes, it was exactly this kind of language in Bond that gave us serious pause. See Bond, 589 F.3d at 268 (noting that trial court’s statement that it was “not going to try and get into [the prosecutor’s] mind” implied that court believed it could stop analysis after prosecutor satisfied step two); Majority Op. at 130.
By stating that “[a]ll the State needs to do it’s done” (App.94) and that the prosecutor’s reasons for his strikes were “valid and sufficient in the record,” (App.92) the trial judge merely performed the step two inquiry.[3] At step two, the prosecutor carries the burden to present justifications for the challenged strikes and the relevant question for the trial judge is whether the given justifications are “facially valid.” Hernandez, 500 U.S. at 360, 111 S.Ct. 1859. The issue at step three is whether the prosecutor’s reasons “relating to views about the death penalty, reasons about use of alcohol, [and] reasons involving family members in crime,” were pretextual. (App.92.)
Had the trial judge permitted defense counsel to make, and had the judge actually considered, the necessary side by side comparisons between seated white and ex *136 cused black jurors that defense counsel urged he should be allowed to present, the judge would have been at least equipped to determine if intentional discrimination was at play. For example, while the prosecutor could meet his burden at step two by stating that he had exercised a strike against a black juror because of the juror’s views on capital punishment, the judge could have found this reason to be pretex-tual at step three if white jurors with similar views on capital punishment were, nevertheless, seated. Instead, however, the trial judge here effectively ruled that defense counsel did not have the right to challenge the credibility of the prosecutor’s proffered reasons by drawing comparisons once the judge found them to be race neutral at step two. While defense counsel was able to sneak some comparisons between seated and excused jurors into the record in spite of the judge’s instructions, the judge made it clear that he was not interested in, and would not consider, these comparisons.[4]
Simply acknowledging that the prosecutor has satisfied his burden at step two cannot constitute a determination as to whether the defendant has shown purposeful discrimination; otherwise, step three would be superfluous. Here, the trial judge not only failed to comment on the credibility of the explanations offered by the prosecutor but also indicated that he believed it would be impossible to discern from the record whether or not there had been intentional discrimination. Therefore, the trial judge omitted the third step of the Batson inquiry.
The Appellate Division committed the same error in failing to evaluate the credibility of the prosecutor’s proffered explanations. The majority acknowledges that the Appellate Division “essentially incorporated,” Majority Op. at 129 (quoting Bond, 539 F.3d at 269), the trial court’s reasoning in its Batson determination, yet the majority is satisfied with the Appellate Division’s analysis because the Appellate Division concluded that the trial court had only accepted the prosecutor’s proffered explanations as “valid” and “legitimate,” “[ajfter hearing argument by both sides.” (App. 116-17); see Majority Op. at 131. The Appellate Division further stated that the trial court’s finding of validity was “sufficiently grounded in the record.” (App. 117.) The majority fails to note, however, that the “finding” made by the trial court and affirmed by the Appellate Division was only that the prosecutor had satisfied his burden at step two. Indeed, at the end of its analysis of the peremptory strikes, the Appellate Division quoted directly from Batson’s step two: “The State carried its burden by articulating ‘clear and reasonably specific’ explanations of its ‘legitimate reasons’ for exercising each of the peremptory challenges.” (App. 117 (quoting Batson, 476 U.S. at 98 n. 20, 106 S.Ct. 1712) (additional citations omitted).) As previously explained, in Batson, the Supreme Court held that a prosecutor’s “neutral explanation” should be “related to the particular case to be tried” and should not merely be an affirmation of the prosecutor’s good faith. Id. at 98, 106 S.Ct. 1712. *137 The footnote in Batson quoted by the Appellate Division was merely a clarification of the prosecutor’s burden at step two.[5] Indeed, the Supreme Court has since explained exactly what was meant by this footnote:
This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a ‘legitimate reason’ is not a reason that makes sense, but a reason that does not deny equal protection.
Purkett v. Elem, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). The Court explained that only at the third step does the question of whether or not a reason “makes sense” come into play: “It is not until the third step that the persuasiveness of the justification becomes relevant-the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.” Id. at 768, 115 S.Ct. 1769.
Thus a court must find a prosecutor’s justification to be “legitimate,” “valid,” and “sufficiently grounded in the record” before it may even proceed to step three. Only “then will [the trial court] have the duty to determine if the defendant has established purposeful discrimination.” Batson, 476 U.S. at 98, 106 S.Ct. 1712. Here, the statement by the Appellate Division that the prosecutor had provided “legitimate reasons” for his challenges only meant that he had provided race neutral reasons actually “related to the particular case to be tried,” id., not that those reasons were truthful or genuine.[6]
Where state courts have omitted step three, we have not hesitated to conduct de *138 novo review. In Hardcastle v. Horn, 368 F.3d 246 (3d Cir.2004), the Pennsylvania Supreme Court reviewed Hardcastle’s challenge to the prosecutor’s use of peremptory strikes on direct appeal in light of the intervening change in law announced in Batson. The court independently combed through the records of voir dire to determine if there were possible race-neutral bases for the challenged peremptory strikes. Id. at 252. After coming up with potential justifications for each strike, the court “concluded that Hardcastle failed to establish a prima facie case of improper use of peremptory challenges under Bat-son.” Id. at 253. On appeal of the district court’s grant of Hardcastle’s habeas petition and under AEDPA, we agreed with the district court that the state court had failed to properly engage in step one but held that the court’s decision to proceed with step two “moot[ed] the issue of whether Hardcastle made a sufficient showing at step one.” Id. at 256. Thus we proceeded to review the state court’s findings at the remaining steps and determined that the state court had completely omitted step three. We explained:
“[A] judge considering a Batson challenge is not required to comment explicitly on every piece of evidence in the record.” However, “some engagement with the evidence considered is necessary as part of step three of the Batson inquiry,” and this - requires “something more than a terse, abrupt comment that the prosecutor has satisfied Batson.”
Id. at 259 (quoting Riley v. Taylor, 277 F.3d 261, 290-91 (3d Cir.2001)). Then, quoting the district court, we stated that the state court’s decision “does not indicate that the court engaged in any analysis or consideration of the credibility of the potential justifications it had proffered. Rather, the court’s decision reads as if the court accepted the justifications at face value.” Id. We therefore held that there was no step three determination to which we could defer and remanded the case to the district court for an evidentiary hearing and de novo review of Hardcastle’s Batson claim. Id. We are now faced with a substantially similar situation in which the trial and appellate courts made no effort to evaluate “the credibility of the potential justifications” proffered. Id. Indeed, here, the trial court blocked defense counsel’s efforts to mount a credibility challenge. This is the crux of step three. In the absence of any analysis of the credibility of the prosecutor’s proffered justifications for his strikes, there is no step three determination to which we can defer. As such, AEDPA deference does not apply to the Appellate Division’s decision and, ideally, step three analysis of Hairston’s Batson claim should be conducted de novo.
II.
Here, however, it is not possible to conduct a step three analysis based on the available trial records. Without all of the voir dire transcripts, we cannot determine whether or not the prosecutor’s justifications were pretextual. For example, even though we have the full voir dire transcript of Mr. Bryant, it is impossible to determine whether the prosecutor’s proffered justification for striking Mr. Bryant was pretextual because defense counsel was improperly cut off by the trial judge when he attempted to make the side by side comparisons between Mr. Bryant and impaneled jurors that are the hallmark of step three. Although defense counsel was still able to draw some comparisons on the record that could indicate pretext on the part of the prosecutor, we are missing relevant voir dire testimony of potential jurors and are left with defense counsel’s characterizations of what was said. These characterizations alone should give us serious pause.
*139 Specifically, the prosecutor asserted that he had exercised a peremptory strike against Mr. Bryant because Mr. Bryant had worked to rehabilitate drug users and alcoholics, and therefore would be sympathetic to Mr. Hairston. Defense counsel noted, however, that the prosecutor had failed to use a strike against Denise Jones, who was married to an alcoholic, and against Michael Pidgeon, who had enrolled in Alcoholics Anonymous three times. If defense counsel’s descriptions of Ms. Jones’s and Mr. Pidgeon’s personal histories are true, this raises questions as to whether the prosecutor acted for the race-neutral reasons stated.
These questions are compounded by the prosecutor’s misrepresentation of the record in offering justifications for his strike. The prosecutor told the trial judge that Mr. Bryant had said that he had a graduate degree in sociology and had written a dissertation on “the relationship between people.” (App.74.) The prosecutor stated that when he asked for clarification regarding Mr. Bryant’s dissertation, he received no response. From the voir dire transcripts, however, it is clear that the prosecutor never asked Mr. Bryant to explain the subject of his thesis, but that Mr. Bryant did so anyway when questioned by defense counsel. The prosecution’s claim that it was confused as to what Mr. Bryant wrote his dissertation on is, therefore, belied by the record. In Miller-El v. Dretke, the Supreme Court indicated that failing to inquire during voir dire on an issue of alleged importance suggests pretext for discrimination. 545 U.S. at 241, 125 S.Ct. 2317. Here, there is some evidence that the prosecutor’s justifications for striking Mr. Bryant were pretextual, but without further evidence corroborating defense counsel’s assertions regarding Ms. Jones and Mr. Pidgeon, we cannot conclusively determine whether the prosecutor purposefully discriminated against African Americans in striking Mr. Bryant from the jury panel.
III.
We have held that where reconstruction of the record is not possible, “the prejudice stemming from our inability to review [a Batson ] claim is not fairly borne by [the defendant].” Simmons, 44 F.3d at 1168. The appropriate remedy, therefore, is to grant Hairston’s habeas petition, give the state an opportunity to retry him, and specify the .time period within which the state must retry or release him. See id. at 1171. I, thus, respectfully dissent from the majority’s opinion affirming the District Court’s denial of Hairston’s habeas petition.

. Jury voir dire was conducted over several months. Prospective jurors filled out a two-part, 19-page questionnaire. Some jurors were excused as early as July 1991 and the remainder were interviewed individually by the trial court and counsel beginning in September 1991. As the majority notes, it took approximately 27 days to select the final pool of 52 eligible jurors. Of the 43 jurors who were seated in court on the day the peremptory strikes were exercised, 10 were African American. Of the 10 peremptory strikes the prosecutor used, 7 were against African Americans.
Unfortunately, the vast majority of the records of voir dire have been destroyed. (See App. 945-47.) We have the voir dire transcripts for only five impaneled jurors and one of the seven stricken African American jurors (Andrew Bryant). The races of the impaneled jurors whose voir dire testimony we have is not discernible from the record.

. Just as side by side comparisons between black and white employees are the most powerful evidence in a Title VII case, side by side comparisons between black and white jury venire panelists are the most powerful evidence in a Batson challenge. The Supreme Court later reinforced the utility of side by side comparisons of stricken and impaneled jurors at step three of the Batson inquiry in Miller-El v. Dretke, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

. The majority fails to note the context in which the trial court made the statement that the prosecutor's reasons were "valid and sufficient in the record.” (App 92.) Here, context is key. Immediately before stating this conclusion, the trial court said:
Each one of these people took an hour and a half to two hours to qualify when we did the voir dire. It is ... possible really to pull out in that hour and a half anything ... to support your view. Gilmore requires that if there’s a showing, that the State must come forward with reasons as to why it used its challenges.... I do find now the State has put forth valid reasons for the exercise of these challenges. That the defense doesn’t concur is not surprising. Of course each side has a distinct point of view of ... this case, in all cases, but the defense does not have a right I don’t believe to put its own place — put himself into [the] prosecutor’s shoes [to] determine what challenges in their view were valid, invalid.
(App.91-92.) The trial court thus indicated that it is impossible to uncover a prosecutor's true motivations for his strikes, even though this is precisely a trial judge's task at step three of Batson. I, therefore, cannot agree with the majority that the trial court’s finding that the prosecutor's reasons were “valid and sufficient in the record” had anything to do with an evaluation of the credibility of the reasons given. See Majority Op. at 131.

. Similarly, it is irrelevant that the Batson motion was made during jury selection — in "live combat,” as the District Court and majority note. The fact that the trial judge presided over 27 days of voir dire and may have been "equipped to make a finding about whether he believed the reasons given by the prosecutor for exercising the state's strike,” does not mean that he actually made such a credibility determination. Here, we have no reason to think that he did since he suggested that such a determination would be impossible. Moreover, the length of the voir dire proceedings in this case actually indicates that it was highly improbable that the trial judge was able to recall the true responses of a prospective juror without reviewing the record and refreshing his memory.

. In full, the footnote reads:
The Court of Appeals for the Second Circuit observed in McCray v. Abrams [750 F.2d 1113 (2nd Cir.1984)7, that “[t]here are any number of bases” on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause. As we explained in another context, however, the prosecutor must give a "clear and reasonably specific” explanation of his "legitimate reasons” for exercising the challenges.
Batson, 476 U.S. at 98 n. 20, 106 S.Ct. 1712 (citations omitted).

. I note that in Bond, we concluded that the use of the word "legitimate” conveyed a step three determination. But there, the state appellate court reasoned as follows: "[bjased upon our review of the record we find no reason to disturb the findings of the trial court as to the legitimacy of the race neutral responses.” 539 F.3d at 268 (internal quotation marks omitted). We held that, "[t]he emphasis on legitimacy demonstrates that the [Pennsylvania] Supreme Court considered the third step of the Batson analysis. Had it stopped at the second step, it merely would have inquired into the existence of 'race neutral’ explanations or responses." Id. at 269.
The use of the word "legitimate” in Bond, however, is distinguishable in three ways. First, it is clear that in Bond, the word "legitimate” referred to the truthfulness of the prosecutor’s reasons rather than whether or not the proffered reasons were actually race neutral because the appellate ■ court commented on the "legitimacy of the race neutral responses,” (emphasis added) rather than on whether the prosecutor had offered "legitimate reasons." Second, as previously noted, in Hairston II, the appellate court was actually quoting directly from a footnote in Bat-son describing the prosecutor’s burden at step two. Finally, in Bond, it was possible for the appellate court to say that the trial court had actually made findings as to the credibility of the prosecutor's explanations because the trial court had stated that, "[r]e-viewing the totality of the circumstances, there is no showing of intentional discrimination by the prosecutor in the jury selection process.” 539 F.3d at 267 (citations omitted). In other words, the trial court had actually made a step three determination to which the appellate court could defer. Here, the trial court did no such thing.